UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **Alwyne BARRATT**, *individually and as executrix of the estate of Alvin Barratt*,<br><br>Plaintiff,<br><br>v.<br><br>**METROPOLITAN LIFE INSURANCE COMPANY, METROPOLITAN INSURANCE AND ANNUITY COMPANY, METROPOLITAN LIFE AND AFFILIATED COMPANIES**, *aka* **METLIFE INSURANCE COMPANY** *agent of* **METLIFE**,<br><br>Defendants. | Civ. No. 2:12-6734<br>(KM)(MAH)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

This case arises out of an insurance coverage dispute. Plaintiff Alwyne Barratt ("Barratt"), individually and as executrix of the estate of her husband, Alvin Barratt, is suing Defendant Metropolitan Insurance & Annuity Co., Inc., now known as Metropolitan Tower Life Insurance Company ("MetLife"). Barratt alleges that MetLife wrongfully failed to pay her death benefits from her late husband's life insurance policy.[1]

---

[1] For simplicity, I use "Barratt" to refer to the plaintiff, Alwyne Barratt. I specify "Alvin" or "Alvin Barratt" when I refer to Plaintiff's husband, now deceased. Defendant states that it is improperly named in the complaint as Metropolitan Life Insurance Company, Metropolitan Insurance and Annuity Company, Metropolitan Life and Affiliated Companies, aka MetLife Insurance Company, agent of MetLife. For simplicity, all of the actual and potential defendant entities are referred to collectively as "MetLife."

1

Now before the Court are the parties' cross-motions for summary judgment. For the reasons set forth below, MetLife's motion for summary judgment on Count V (violation of the covenant of good faith and fair dealing) is GRANTED. Both sides' motions for summary judgment are otherwise DENIED.

Barratt has agreed to voluntarily withdraw Counts II (violation of the New Jersey Consumer Fraud Act), III (common law legal and equitable fraud), and VI (estoppel and waiver) of the complaint. Counts II, III, and VI will therefore be DISMISSED without prejudice. Count IV (breach of a covenant of performance) will also be DISMISSED without prejudice because it is redundant in light of Count I (breach of contract).

## I. BACKGROUND

### a. Facts[2]

---

[2] I set forth the facts as agreed and disagreed upon in the parties' respective L. Civ. R. 56.1 Statements. Pursuant to this Court's Order on February 19, 2015 (ECF No. 26), the parties have submitted certain revised moving papers and 56.1 Statements (ECF Nos. 24, 27, 28).

The Rule 56.1 Statement citations are as follows.

For MetLife's motion (ECF No. 13):
    MetLife's Statement, ECF No. 13-2 = DS 13
    Barratt's Response, ECF No. 19 = PS 13
For Barratt's motion (ECF No. 15):
    Barratt's Statement, ECF No. 16-1, p.6–10 = PS 15
    MetLife's Response, ECF No. 18 = DS 15
For Barratt's revised motion (ECF No. 24):
    Barratt's Statement, ECF No. 24-3 = PS 24
    MetLife's Response, ECF No. 28 = DS 24

The Exhibit citations are as follows:

For MetLife's motion (ECF No. 13):
    Affidavit of James Joseph McCarthy, dated September 11, 2013, submitted in support of MetLife's motion, ECF No. 13-4 (Exhibits are attachments 5–13) = McCarthy Aff.
For Barratt's revised motion (ECF No. 24):
    Affidavit of Alwyne Barratt, dated February 13, 2015, submitted in support of Barratt's motion, ECF No. 24-2 = Barratt Aff.
    Exhibits attached to Barratt's motion are referred to by number (e.g., "Pl. Ex. 8") and are accessible at ECF No. 24, Attachments 4–14).

2

### i. *The 1986 Policy covering Alvin Barratt*

On December 11, 1986, Plaintiff Alwyne Barratt's husband, Alvin Barratt ("the Insured" or "Alvin"), purchased a life insurance policy ("1986 Policy") from MetLife. (PS 24 ¶1). The value of the 1986 Policy was $100,000. (*Id.* ¶2). It was a flexible premium policy, meaning that the actual amount that Alvin was obligated to pay each month could be changed upon Alvin's request, so long as there was enough money in the so-called "Accumulation Fund" to maintain coverage. (*See id.* ¶10; DS 24 ¶10 (citing McCarthy Aff. Ex. A, Bates No. 000007)).

The 1986 Policy also contained a Spouse Term Rider, which provided a death benefit to Alwyne Barratt in the amount of $100,000. (PS 24 ¶2). On April 11, 1991, Alvin Barratt increased the value of the 1986 Policy to $250,000. (*Id.* ¶4).

The 1986 Policy included a "Rider Regarding the Payment of Planned Premiums Under the Check-O-Matic Arrangement," under which MetLife would automatically withdraw monthly premiums for the 1986 Policy from Alvin Barratt's Merrill Lynch bank account, xxxx3501 ("designated account" or "joint account"). (*Id.* ¶¶5–7; DS 24 ¶¶5–7). The terms of the Check-O-Matic Rider are as follows:

> This rider provides that planned premiums for this policy will be payable each month under the Check-O-Matic arrangement. Under this arrangement, we are authorized to

---

Citations to the parties' moving papers are as follows:
For MetLife's motion (ECF No. 13, brief at ECF No. 14):
    MetLife's Motion, ECF No. 14 = Def. 13 Mot.
    Barratt's Opposition, ECF No. 20 = Pl. 13 Opp.
    MetLife's Reply, ECF No. 22 = Def. 13 Reply
For Barratt's motion (ECF No. 15, brief at ECF No. 16-1):
    Barratt's Motion, ECF No. 16-1 = Pl. 15 Mot.
    MetLife's Opposition, ECF No. 17 = Def. 15 Opp.
For Barratt's revised motion (ECF No. 24, brief at ECF No. 24-1):
    Barratt's Motion, ECF No. 24-1 = Pl. 24 Mot.
    MetLife's Opposition, ECF No. 27 = Def. 24 Opp.

> draw checks or share drafts, or to issue directions to debit a bank account, each month to pay the planned premium.
>
> This rider will end if:
> 1. We do not receive the full amount of any check, share draft, or account debit charged by us;
> 2. The insured, the owner if other than the insured, or the account depositor sends us a written request to end the rider; or
> 3. We send a written notice that the rider will end to the insured, the owner if other than the insured, and the account depositor.
>
> If this rider ends while the policy is in force further planned premiums will be payable directly to us. Premiums may be paid at any time and in any amount subject to the terms of the policy.

(McCarthy Aff. Ex. A, Bates No. 000018).

### ii. The 1991 Policy covering Alwyne Barratt

On or about May 11, 1991, the spousal coverage for Alwyne Barratt under Alvin's 1986 Policy was converted into a separate life insurance policy for Alwyne Barratt in the amount of $100,000 ("1991 Policy"). (PS 24 ¶11; DS 24 ¶11). The monthly premium payment for the 1991 Policy was $117, and it was paid consistently from April 24, 1991 through June 13, 2011. (DS 24 ¶¶17–18). Barratt's bank statements for the Designated Account reflect a monthly deduction to MetLife for $117 during this time period. (PS 24 ¶15 (citing Pl. Ex. 8)); DS 24 ¶15 ("MetLife's records show that monthly premium payments of $117 consistently were paid on the 1991 Policy via Check-O-Matic From April 24, 1991 through June 13, 2011")).

### iii. Payment History for the 1986 Policy

According to MetLife's records, monthly Check-O-Matic payments of $125 were paid for the 1986 Policy until May of 1990. (DS 24 ¶8 (citing McCarthy Aff. ¶¶4, 6, 8, Ex. B)). MetLife, citing to its record of the Policy Cash Flow History, asserts that from May 1990 to February 1992,

4

sporadic payments were made for the 1986 Policy; from February 1992 to May 1998, monthly payments of $38 were made; and from May 1998 to August 2000, monthly payments of $85.35 were made. (DS 24 ¶15 (citing McCarthy Aff. ¶¶4, 6, 8, Ex. B)). MetLife also asserts that on April 27, 1998, a single payment of $332.58 was made for the 1986 Policy. (DS 13 ¶11).

The fluctuations in the payments to some extent reflect Alvin Barratt's requested changes. On or about January 29, 1991, Alvin executed a Request for Change in the Planned Premium Payment Amount, which reduced the monthly premium payment from $125 to $38. (PS 24 ¶12; DS 24 ¶12; McCarthy Aff. Ex. C). On or about April 25, 1998, Alvin executed another Request for Change in the Planned Premium Payment Amount, which increased the monthly premium payment from $38 to $85.35. (PS ¶4; DS ¶4).

MetLife explains that although the payments from May 1990 to February 1992 were sporadic, there were sufficient funds in the Accumulation Fund to pay the monthly premiums for the 1986 Policy for this time period, so that the coverage remained in force. (DS 13 ¶7).

Barratt verbally disputes that payments were sporadic, but does not cite any evidence regarding payments. (PS 13 ¶6). Rather, Barratt asserts that "MetLife had the contractual obligation to withdraw funds via Check-O-Matic from Barratt's Merrill Lynch account." In support, she cites bank statements for the Designated Account for a time period other than the period of the allegedly sporadic payments. (*Id.* (citing Pl. Ex. 8)).

MetLife asserts that it sent a letter to Alvin Barratt on or about July 11, 2000, informing him that premiums for the 1986 Policy had not been fully paid, and that if Alvin Barratt did not pay $391.04 to MetLife, his coverage would lapse. (DS 24 ¶17 (citing McCarthy Aff. ¶9, Ex. E)).[3]

---

[3] MetLife does not explain how the $391.04 number was calculated.

5

MetLife further states that because no additional payments were made for the 1986 Policy, it lapsed on or about September 10, 2000. (*Id.*, McCarthy App. ¶11). MetLife asserts that it sent a letter to Alvin Barratt on or about September 11, 2000, advising him of the lapse of his 1986 Policy. (*Id.* (citing McCarthy Aff. ¶10, Ex. F)).

Barratt maintains that neither she nor her husband ever received lapse letters. (PS 24 ¶¶17–20). She states that MetLife continued to withdraw monthly premiums from the designated account, even after Alvin Barratt's death in 2009. (*Id.* ¶21). MetLife admits this, but says that these withdrawals were taken as premium payments for the 1991 Policy, not the 1986 Policy. (DS 24 ¶21 (citing McCarthy Aff. ¶17, Ex. I (reflecting monthly payments of $117 on the 1991 Policy)).

### iv. The Current Dispute

Alvin Barratt died in November of 2009. (PS 24 ¶24; DS 24 ¶24). Following Alvin's death, Alwyne Barratt attempted to collect death benefits from the 1986 Policy from MetLife. (PS 24 ¶25; DS 24 ¶25). MetLife refused to pay the death benefits. It informed Barratt that the premiums it had been withdrawing from the designated joint bank account covered only the 1991 Policy, not the 1986 Policy, and that the 1986 Policy had lapsed. (PS 24 ¶¶26–27; DS 24 ¶¶26–27). Barratt brings this action to collect the death benefits from the 1986 Policy.

### b. Procedural history

Barratt originally filed her complaint on August 24, 2012, in the Superior Court of New Jersey, Law Division, Essex County. (Notice of Removal ¶1). MetLife removed the complaint to this district court on October 25, 2012. (*Id.* ¶7).

In the complaint, Barratt pleads six causes of action: (1) breach of contract; (2) violation of the New Jersey Consumer Fraud Act; (3) common law legal and equitable fraud; (4) breach of a covenant of

performance; (5) violation of the covenant of good faith and fair dealing; and (6) estoppel and waiver. (Compl., ECF No. 16-4[4]; Def. 13 Mot. 1–2).

Plaintiff Barratt is a resident and citizen of New Jersey. (Notice of Removal ¶5, ECF No. 3). Defendant MetLife is an insurance company organized under the laws of the State of New York, with its principal place of business in New York. (*Id.* ¶5). This Court has jurisdiction based on the parties' complete diversity of citizenship and the amount in controversy exceeding $75,000. (*Id.* ¶7). *See* 28 US.C. § 1332.

On September 12, 2013, MetLife filed a motion for summary judgment as to all counts in the complaint. (ECF No. 13). On September 13, 2013, Barratt, too, filed a motion for summary judgment. (ECF No. 15). On February 17, 2015, pursuant to this Court's order (ECF No. 23), Barratt filed a revised motion for summary judgment (ECF No. 24).

## II.   DISMISSAL OF COUNTS II, III, IV, & VI

In her opposition to MetLife's motion for summary judgment, Barratt states that she "hereby withdraws [her] allegations of fraud," and "withdraws the estoppel and waiver claims." (Pl. 13 Opp. 3). Barratt has not filed an amended complaint to reflect these withdrawals. I will therefore dismiss Count II (violation of the New Jersey Consumer Fraud Act), Count III (common law legal and equitable fraud) and Count VI (estoppel and waiver) of the complaint, without prejudice.

I will also sua sponte dismiss Count IV of Barratt's complaint, which alleges "breach of a covenant of performance." This Court can find no case law to support the existence of a "breach of a covenant of performance" claim separate and apart from a breach of contract claim.

---

[4] It appears several pages of the complaint were left out of the uploaded complaint attached to MetLife's Notice of Removal (Count IV was truncated and Counts V and VI were not included at all). Therefore, I refer to the complaint as it appears in its full form in Exhibit 1 to MetLife's motion for summary judgment (Compl., ECF No. 16-4).

The parties do not cite any such law, and the parties' arguments deal only with breach of contract. Therefore, I will dismiss Count IV without prejudice because it is redundant. *See* Fed. R. Civ. P. 12(f) (A "court may strike from a pleading . . . any redundant . . . matter . . . on its own."); *Valcom, Inc. v. Vellardita*, No. 2:13-CV-3025-WHW-CLW, 2014 WL 2965708, at *9 (D.N.J. July 1, 2014) ("A district court has the power to sua sponte dismiss a pleading under Rule 12(b)(6)") (citing *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010); *Bethea v. Nation of Islam*, 248 Fed. App'x 331, 333 (3d Cir. 2007)).

Thus the only remaining claims in the complaint are for breach of contract (Count I) and breach of the covenant of good faith and fair dealing (Count V).

## III. CROSS-MOTIONS FOR SUMMARY JUDGMENT
### a. Summary judgment standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Daniels v. Sch. Dist. Of Phila.*, No. 14-1503, 2015 WL 252428, at *6 (3d Cir. Jan. 20, 2015). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *Heffernan v. City of Paterson*, No. 14-1610, 2015 WL 265514, at *2 (3d Cir. Jan. 22, 2015). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

8

If the moving party meets its threshold burden, the opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial.").

When, as here, the parties file cross-motions for summary judgment, the governing standard "does not change." *Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp. 2d 463, 468–69 (D.N.J. 2002) (citing *Weissman v. U.S.P.S.*, 19 F. Supp. 2d 254 (D.N.J. 1998)). The court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 184 (2009); *Williams v. Philadelphia Hous. Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994). That one of the cross-motions is denied does not imply that the other must be granted. For each motion, "the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation and citations omitted).

### b. Breach of contract (Count I)

There are two genuine issues of material fact in dispute: (1) the reasons why MetLife stopped withdrawing funds from the joint account to pay for the 1986 Policy; and (2) whether MetLife sent a notice of

impending lapse for the 1986 Policy. Therefore, summary judgment is inappropriate for either party on Count I of the complaint, alleging breach of contract.

To establish a breach of contract claim, Barratt must show (1) "that the parties entered into a valid contract"; (2) "that the defendant failed to perform [its] obligations under the contract"; and (3) "that the plaintiff sustained damages as a result." *Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007).[5]

MetLife says that it stopped withdrawing funds from the joint account to pay the premium for the 1986 Policy because the bank balance was not sufficient to cover the premiums. (Def. 13 Reply 5). Because the Accumulation Fund's balance was not large enough to keep the 1986 Policy in force, the 1986 Policy lapsed in September of 2000. (*See* Def. 13 Mot. 2–3). MetLife claims that it sent two lapse letters to Alvin Barratt: one to inform him of the impending lapse of his 1986

---

[5] "[I]n a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case." *Warriner v. Stanton*, 475 F.3d 497, 499–500 (3d Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). New Jersey uses the most-significant-relationship test, which consists of two prongs. *Maniscalco v. Brother Int'l Corp. (USA)*, 793 F. Supp. 2d 696, 704 (D.N.J. 2011), *aff'd*, 709 F.3d 202 (3d Cir. 2013). First, the court must determine whether a conflict actually exists between the potentially applicable laws. *P.V. v. Camp Jaycee*, 197 N.J. 132, 143, 962 A.2d 453, 460 (2008) ("Procedurally, the first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between them.") (internal quotations omitted). "[I]f no conflict exists, the law of the forum state applies." *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 717 (D.N.J. 2011) (quoting *P.V.*, 197 N.J. at 143, 962 A.2d at 453). If a conflict exists, the court then moves to the second prong: it must determine "which state has the 'most significant relationship' to the claim at issue by weighing the factors" in the applicable section of the Restatement (Second) of Conflict of Laws. *Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 134 N.J. 96, 102, 629 A.2d 885, 888 (1993).

The parties seem to agree that New Jersey law applies in this diversity action. At any rate, they point to no aspect in which the application of non-forum law would change the result. Having been directed to no applicable conflict, I apply general principles of New Jersey contract law.

Policy and a second letter to inform him of the actual lapse of the 1986 Policy. (*Id.* 3).

Barratt responds that MetLife stopped its automatic withdrawal of premium payments from the designated account to pay for the 1986 Policy "through no fault of the insured." (Pl. 24 Mot. 6). She does not make any claims about the balance of the designated account at the time of the lapse of the 1986 Policy. Rather, she observes that MetLife continued to take monthly withdrawals from the same designated account to pay for the 1991 Policy. (*Id.*). Thus, Barratt appears to be arguing that MetLife could have continued to withdraw funds from the designated account for the 1986 Policy as well. Barratt also argues that neither she nor her husband ever received the lapse letters. (*Id.*).

If MetLife erroneously stopped withdrawing payments from the designated account, or if MetLife failed to send a notice of impending lapse to Alvin Barratt, this would constitute a breach of its obligations under the 1986 Policy. Because the parties have produced evidence to show that both of these issues are in dispute, summary judgment is inappropriate for either party on Count I of the complaint.

### i. *Why MetLife stopped withdrawing funds from the joint account to pay for the 1986 Policy*

The first issue of material fact is whether MetLife stopped withdrawing funds from the designated account because it did not contain sufficient funds to pay the premium for the 1986 Policy.

Barratt claims that MetLife violated the terms of the Check-O-Matic rider to the 1986 Policy, requiring MetLife to automatically withdraw payments from the bank account jointly owned by Alwyne and Alvin Barratt to pay the premium for that policy. (PS 24 ¶¶5–7; DS 24 ¶¶5–7). The rider's provisions state that it will end only if: (1) Metlife "do[es] not receive the full amount of any check, share draft, or account

11

debit charged by [MetLife]"; (2) "The insured, the owner if other than the insured, or the account depositor sends [MetLife] a written request to end the rider; or" (3) "[MetLife] send[s] a written notice that the rider will end to the insured, the owner if other than the insured, and the account depositor." (*Id.*). Barratt claims that none of these three events occurred, and that MetLife erroneously stopped withdrawing payments automatically each month.

MetLife claims that the 1986 Policy lapsed on or about September 10, 2000. (DS 24 ¶17 (citing McCarthy Aff. ¶10 and Ex. F)). This claim implies that there were insufficient funds in Alvin and Alwyne Barratt's joint bank account to pay the premium and there were also insufficient funds in the Accumulation Fund to sustain the policy. (DS 24 ¶10 (implying that coverage would be in force so long as there were sufficient funds in the Accumulation Fund)). However, MetLife only points to its own internal records to substantiate these arguments. (*See* McCarthy Aff. ¶4, 6, 8, 11, Ex. B). The only relevant record (apart from McCarthy's sworn affidavit) is the "1986 Policy Cash Flow History" (*id.* Ex. B). That record does not show one way or the other whether Alvin and Alwyne Barratt's joint account had insufficient funds. Indeed, *neither* party submitted bank records showing the balance of the joint account, or MetLife records showing the balance in the Accumulation Fund, at the time MetLife stopped withdrawing funds to pay for the 1986 Policy.

Whether there were insufficient funds in the bank account and the Accumulation fund to sustain the 1986 Policy is a disputed issue of material fact.

### ii. *Whether MetLife sent a lapse letter*

A second issue of material fact as to Count I is whether MetLife sent a letter to Alvin Barratt notifying him of the impending lapse in coverage.

MetLife asserts that its "records reflect[] that there was a request to pay $391.04 in July of 2000 to retain coverage." (DS 24 ¶17 (citing McCarthy Aff. ¶9 and Ex. E)). "If this amount was not received, the Policy would lapse without value at the end of the grace period, as defined by the 1986 Policy." (*Id.* (citing McCarthy Aff. ¶9 and Ex. A at Bates No. 000008)). The 1986 Policy defines grace period as follows:

> If the accumulation fund on any monthly anniversary, minus any policy loan and loan interest, is less than the monthly deduction for that month, there will be a grace period of 61 days after that anniversary to pay an amount that will cover the monthly deduction. We will send you a notice at the start of the grace period. We will also send a notice to any assignee on our records.
>
> If we do not receive a sufficient amount by the end of the grace period, your policy will then end without value.

McCarthy Aff. Ex. A at Bates No. 000008. Thus, MetLife was required to send a notice of impending lapse at the start of the grace period.

MetLife claims that it did so: "MetLife's records reflect that, a letter advising of the impending lapse of the 1986 Policy due to failure to pay premiums sufficient to sustain the Policy was automatically generated and sent to decedent on or about July 11, 2000." (DS 24 ¶17 (citing McCarthy Aff. ¶9 and Ex. E)). MetLife claims that a second "letter advising of the [actual] lapse of the 1986 Policy was automatically generated and sent to decedent on or about September 11, 2000." (*Id.* (citing McCarthy Aff. ¶10 and Ex. F)). However, MetLife admits that it does not have a copies of the actual lapse letters. (*Id.* ¶12, McCarthy Aff. ¶9).

The records to which MetLife refers are identified as "[a] copy of the Pending Lapse Report" (McCarthy Aff. ¶9, Ex. E) and "[a] copy of the Lapse Report" (*Id.* ¶10, Ex. F). The exhibits themselves are internal records that appear to be lists including policy numbers, names of insured parties, lapse dates, the amounts the insureds must pay to

13

retain coverage, and other information. (*See* McCarthy Aff. Ex. E, F). It is not clear what they prove. These exhibits could be, for example, lists of people to whom a lapse letter should be sent, or lists of people to whom a lapse letter was sent. It is not clear how MetLife compiles its spreadsheets, who is in charge of entering this data, and what sort of process MetLife has in place to verify that lapse letters are actually sent. Without more, MetLife's cited lists are not sufficient to cut off a material, genuine issue of fact.

For her part, Barratt cites her affidavit, in which she claims:

> There was no notice, written or otherwise from MetLife that MetLife had discontinued withdrawing Planned Premium "Check-O-Matic" funds from the designated account for either policy. In fact, the designated bank account statements show that MetLife was still withdrawing payments per the Check-O-Matic arrangement.

(Barratt Aff. ¶17,[6] *see also* ¶¶18–20).[7]

MetLife argues that Alwyne Barratt "has no personal knowledge of what her late husband did or did not receive." (Def. 24 Opp. 1). That is possible, but not indisputable. Alwyne and Alvin shared a bank account, lived at the same address, and were married at the time of Alvin's death. (*See* Compl. page 1; Pl. Ex. 11). A jury could infer that Alwyne had personal knowledge of her husband's financial affairs and would have discussed with him important matters like the impending termination of

---

[6]   Barratt cites to exhibits throughout her affidavit. I will only consider those statements in Barratt's affidavit of which she could reasonably have personal knowledge.

[7]   MetLife acknowledges that it continued to withdraw funds from Alvin and Alwyne's joint bank account but claims that its withdrawals were only for the 1991 Policy. (DS 24 ¶17). It appears to be MetLife's position that, at the time it stopped withdrawing funds from the joint account for the 1986 Policy, there was enough money in the joint account to cover the premium for the 1991 Policy but not enough to cover the 1986 Policy, which is why MetLife stopped withdrawing funds for the 1986 Policy but continued to make withdrawals for the 1991 Policy. (PS ¶27; DS ¶27).

his life insurance policy. To rule otherwise would require me to make a credibility determination, impermissible at the summary judgment stage.

At least two issues of material fact bar an award of summary judgment to either party on Count I, Barratt's breach of contract claim.

### c. Breach of covenant of good faith and fair dealing (Count V)

Summary judgment will be granted to MetLife on Count V of Barratt's claim, alleging breach of the covenant of good faith and fair dealing.

"All contracts impose an implied obligation of good faith and fair dealing in their performance and enforcement." *Badiali v. N.J. Mfrs. Ins. Grp.*, 107 A.3d 1281, 1287 (N.J. 2015) (internal citations omitted). "Good faith is generally defined as 'honesty in fact in the conduct or transaction concerned.'" *Id.* (quoting N.J.S.A. 12A:1-201(19)).

The general implied contractual covenant of good faith, however, has a particular application to insurance contracts:

> The good faith obligations of an insurer to its insured run deeper than those in a typical commercial contract. Unlike with a typical commercial contract, in which proof of bad motive or intention is vital to an action for breach of good faith, an insurer's breach of good faith may be found upon a showing that it has breached its fiduciary obligations, regardless of any malice or will.

*Badiali*, 107 A.3d at 1287. (internal quotations and citations omitted). Examples of bad faith conduct by insurance companies include "refusing to pay claims without conducting a reasonable investigation based upon all available information" and "not attempting to negotiate in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." *Id.* (quoting N.J.S.A. 17:29B-4(9)(d) and (f)) (internal quotations omitted).

"A finding of bad faith against an insurer in denying an insurance claim cannot be established through simple negligence" or by "mere failure to settle a debatable claim." *Id.* 1288 (citing *Pickett v. Lloyd's*, 621 A.2d 445, 453, 457 (N.J. 1993)). "Rather, to establish a first-party bad faith claim for denial of benefits in New Jersey, a plaintiff must show 'that no debatable reasons existed for denial of the benefits.'" *Id.* (citing *Pickett*, 621 A.2d at 457). As the New Jersey Supreme Court instructed:

> Under the salutary "fairly debatable" standard enunciated in *Pickett*, a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad faith refusal to pay the claim.

*Id.* (internal quotations and citations omitted).

I agree with MetLife that Barratt's underlying contract claim is "fairly debatable," and that it cannot be the basis for a bad faith claim. Barratt's bad faith claim is limited to the following allegation: "defendant has violated that covenant of good faith by refusing to honor the policy and make payment to the plaintiff upon the death of plaintiff's husband." (Compl. ¶3). Barratt does not allege any other grounds for this count. MetLife has records to show that, at least from its perspective, the 1986 Policy had lapsed well before Alvin Barratt's death because he had failed to make premium payments. MetLife has other records to show that, at least from its perspective, it sent notices of cancellation, which Barratt claims were never received. Such contentions are debatable; MetLife's obligation to pay is and was not so clear that its refusal to pay the claim amounts to bad faith.

MetLife has offered plausible justifications, but even taking Barratt's allegations at face value, I must conclude that there is no viable bad faith claim here. Because an insurer does not breach its duty of good faith based on the "mere failure to settle a debatable claim," I will award summary judgment to MetLife on Count V of the complaint. *Badiali*, 107

A.3d at 1288.

### IV. CONCLUSION

MetLife has carried its burden under Fed. R. Civ. P. 56 of showing that there is no genuine dispute of material fact as to Count V of the complaint, alleging breach of the covenant of good faith and fair dealing. Accordingly, MetLife's motion for summary judgment on Count V is GRANTED.

Both sides' motions for summary judgment are otherwise DENIED.

On consent, Counts II (violation of the New Jersey Consumer Fraud Act), III (common law legal and equitable fraud), and VI (estoppel and waiver) of the complaint are DISMISSED without prejudice. Count IV (breach of covenant of performance) is DISMISSED without prejudice because it is redundant in light of Count I (breach of contract).

An appropriate order will be entered in accordance with this Opinion.

Dated: March 26, 2015

*[signature]*

**Hon. Kevin McNulty**
**United States District Judge**